**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TARAH WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>MANSUETO VENTURES LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 1:26-cv-05055-VEC<br><br>**<u>FIRST AMENDED</u> CLASS ACTION COMPLAINT FOR (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 638.51; (2) INTRUSION UPON SECLUSION; (3) VIOLATION OF THE FEDERAL WIRETAP ACT (AS AMENDED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986), 18 U.S.C. § 2510, *ET SEQ.*; (4) INTERCEPTION IN VIOLATION OF CIPA, CAL. PENAL CODE § 631** |

## INTRODUCTION

1. Plaintiff, on her behalf and on behalf of a class of similarly situated persons, brings this action against Defendant Mansueto Ventures LLC ("Defendant" or "Mansueto"). Mansueto is a leading publisher of print and online publications focused on business, including Fast Company, published online at www.fastcompany.com (the "Website").

2. Defendant has installed and deployed data broker software, and software created by Queryly LLC, on the Website to secretly collect data about visitors, their devices, locations and views of webpages to identify who they are, target them with unwanted marketing and track them on an ongoing basis. Defendant uses the Website to obtain advertising revenue and to sell subscriptions to Fast Company.

3. The data broker software compiles the collected data and correlates it with extensive external records data brokers already have about most Californians in order to learn the identity of Website visitors.

4. Both Defendant and the data brokers behind the software involved benefit commercially and financially from this activity. They benefit because collected visitor data, and

the identification of visitors using that data, are used to, among other things, target Website visitors for specific marketing. The data brokers benefit because they use the data to compile a more comprehensive profile of visitors, or they can sell the data/profiles for advertising and other purposes.

5. Defendant's installation and use of data broker software without obtaining consent or authorization therefore violated California Penal Code § 638.51, California's Trap and Trace Law, and duties under applicable common law Defendant owed to Plaintiff and other visitors to the Website similarly situated to her.

6. The Queryly software on the Website automatically transmits in real time the content of search queries conducted by visitors to the Website to Queryly. Queryly collects and processes search activities to serve its clients, but also uses the data its software collects to enhance its products and services – products and services that it offers to *many* clients, not just the client operating the website in question. Plaintiff conducted searches on the Website, and these were transmitted to Queryly in real time. Plaintiff did not consent to such transmission.

7. Defendant's installation and deployment of the Queryly software violated the Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. § 2510, *et seq.*, and the interception provision of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total amount in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

9. This Court has general jurisdiction over Defendant Mansueto, a Delaware limited liability company, because it has its headquarters located in New York, New York.

10. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in this District (New York, New York).

## PARTIES

11. Plaintiff Tarah Williams ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

12. Defendant is a Delaware limited liability company, with its headquarters in New York, New York, that publishes the magazine *Fast Company* on the Website.

13. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

14. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

15. Defendant owns and operates the Website. Defendant uses the Website to publish *Fast Company* and to sell subscriptions thereto.

16. On September 10, 2025, Plaintiff visited the Website. When she did, data that reasonably likely identified her were transmitted to at least three (3) third parties who used and profited from that data, along with Defendant: LiveRamp Holdings, Inc. ("LiveRamp"), Comscore, Inc. ("Comscore") and Nielsen. This occurred through the operation of software and code on the Website. Plaintiff also conducted at least 2 searches using the search mechanism on the Website. The content of her search queries were transmitted to Queryly.

### Defendant Shares Visitors' Data with at least 3 Data Brokers and Queryly

17. Defendant has partnered with at least three registered California data brokers, LiveRamp, Comscore and Nielsen (the "Data Brokers"), in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to the Data Brokers on the Website.

18. The code supplied by LiveRamp, Comscore and Nielsen deployed on the Website (the "Data Broker Code") is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Data Broker code identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like the Data Brokers to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

**Browser Fingerprinting**

19. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to the 3 Data Brokers? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

20. The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell the Data Brokers who you are. (These data points are *usually* accompanied with information such as the webpage you viewed just prior to arrival, and geolocation data.) The Data Brokers may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

21. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions

- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

22. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will load properly on a visitor's screen only with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being provided, by a website operator's actions, to ***third parties not involved in operation of the website itself, or the rendering of the website's contents on the screens of visitors.*** The third parties do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

23. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You:

24. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.[2]

25. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4]

**The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers**

26. Collection of visitor data by entities such as the Data Brokers – including collection by these entities of unique identifiers that the Data Broker code assigns to visitors to the websites of advertising companies like Mansueto – enables ongoing tracking of website visitors as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of the Data Brokers and similar organizations.

27. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 6/7/2026).

[2] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[4] *Id.*

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

**Registered California Data Brokers**

28. Registered California data brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

29. Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

30. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

31. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[5]

32. Given the amount of data available by way of California registered data brokers' practices, a company like Mansueto has an incentive to partner with data brokers so that it can learn the identity of visitors in order to target them with specific marketing materials.

33. Here, Defendant partnered with LiveRamp, Comscore and Nielsen by installing LiveRamp, Comscore and Nielsen code onto the Website. Defendant allows LiveRamp, Comscore and Nielsen, and possibly other data brokers, to access, use, and monetize the visitor data provided by Defendant, in ways that remain undisclosed to the public.

**LiveRamp Code**

34. LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp code on Defendant's Website tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LiveRamp code functions as follows:

---

[5] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

35. First, when the LiveRamp code loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

36. Second, the data obtained by the LiveRamp code is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

37. Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number). LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

38. Identification of website visitors through the LiveRamp code happens in "real-time," allowing the websites of LiveRamp's customers to "access people-based data immediately at the time of impression." It also works across devices: In other words, the LiveRamp code can inform websites using it that the same account or person has accessed the website from different devices. As LiveRamp explains, "[w]ith impressions matched to a persistent people-based ID, data are stitched across devices and not lost over time with new cookies or phones."

39. Plaintiff was subjected to the LiveRamp code as described *supra* starting when she requested that the Website load on her device on September 10, 2025.

**Comscore Code**

40. Comscore, Inc. ("Comscore") is a data broker that monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

41. The Comscore code functions as follows: First, when a user visits a tagged site, the Comscore code triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time – including the user's IP address, a timestamp, and browser type.

42. Second, the Comscore code sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

43. Third, the Comscore code intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites. In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comscore can then sell.

44. The Comscore code thus facilitates continuous, cross-site tracking of users via a unique ID tied to their devices.

45. Plaintiff was subjected to the Comscore code as described *supra* starting when she requested that the Website load on her device on September 10, 2025.

**Nielsen Code**

46. Nielsen operates an extensive digital tracking regime through its Nielsen Marketing Cloud and Digital Ad Ratings services. Nielsen's tracking employs various pixels and SDKs across devices. For web and mobile, Nielsen tags (often called Nielsen DAR tags or Nielsen pixels) are placed in ads and on sites to beacon back user info for measurement. These tags intercept key identifying signals in real time – on desktop they capture the user's IP address, Nielsen cookie ID, browser type and settings, device characteristics, and even hashed email if available.

47. All this data is transmitted to Nielsen's servers moment-by-moment as content or ads are consumed. Critically, Nielsen combines these data points to perform "deduplicated" tracking across platforms – linking the same person's phone, desktop, and TV viewership. For example, Nielsen's systems will recognize if the IP address and a hashed email from a streaming app correspond to the same user who appeared via a cookie on a website, thereby unifying those records under one Nielsen ID. Nielsen openly acknowledges collecting hashed email addresses and other identifiers to facilitate this cross-device matching.

48. Once intercepted, the data is fed into Nielsen's identity graph and panels to assign demographics (age, gender, etc.) or outcomes (conversions) to that user. Essentially, Nielsen's pixel and SDK network function as an omnipresent sensor array: whether a user is watching a Smart TV app, browsing on mobile, or reading news on a laptop, Nielsen tags are there to silently capture that "envelope" information (who/when/where) and phone it home to Nielsen for aggregation and sale to anyone who wants to buy it.

49. Plaintiff was subjected to the Nielsen code as described *supra* starting when she requested that the Website load on her device on September 10, 2025.

**Queryly Code**

50. Defendant also installed, and deploys software supplied by Queryly LLC on the Website. This software transmits the content of search queries entered by visitors to the Website when they click on the magnifying glass icon at the top left side of the homepage of the Website to Queryly, a third party. This is performed for the benefit of both Defendant and Queryly. Defendant can use the data for analytics, to obtain more advertising dollars for space on the Website. Queryly can use the search data it obtains through the operation of its software on the Website to enhance its own products and services, which it offers to many companies. On information and belief, Queryly can associate searches conducted by an individual on one website with a device and/or browser. Further, on information and belief, such search data can be supplied by Queryly to companies operating other websites.

51. When Plaintiff visited the Website on September 10, 2025, Queryly code operating on the Website transmitted two search queries she entered in the Website's internal search bar: (1) "health care" and (2) "nonprofit." These queries were transmitted to Queryly in real time, keystroke by keystroke, along with an identifier associated with Plaintiff's device/browser and visit to the Website. At no time did Plaintiff consent to the transmission of her search queries to any third party.

**Troubling Implications of Third-Party Data Sharing**

52. Companies using third-party tracking software – such as the Data Broker code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

53. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

54. As data brokers, LiveRamp, Comscore and Nielsen can use data they received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

55. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[6]

[6] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

56. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[7]

57. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[8]

58. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[9] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

59. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[10]

60. In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection

---

[7] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).
[8] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).
[9] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).
[10] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

"bought data from the online advertising ecosystem to track peoples' precise movements over time …"[11]

**Data and Related Profiles of Consumers Have Economic Value**

61. The type of visitor data transmitted via the Website to the Data Brokers has economic value – as is obvious from the fact that these third parties create code to collect it, and Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Data Broker code on the Website.

62. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[12]

63. As recently explained by the Law Institute:[13]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become

---

[11] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/2026).

[12] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

[13] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

> increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

64. There exists an established market for the type of personal data collected and transmitted through the Data Broker code running on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals'

internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

## CLASS ALLEGATIONS

65. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and conducted at least one query using the Website's internal search bar.**

66. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

67. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

68. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant's actions violate California common or statutory law;
b. Whether Plaintiff and Class members are entitled to statutory damages;
c. Whether Plaintiff and Class members are entitled to punitive damages;
d. Whether Plaintiff and Class members are entitled to injunctive relief;
e. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

f. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

69. TYPICALITY: Plaintiff was subjected to the Data Broker code running on the Website when she visited the Website on September 10, 2025. As a result, her data was transmitted to LiveRamp, Comscore and Nielsen, and possibly other third parties, for fingerprinting/identification and tracking purposes. Her claims are therefore typical of the Class.

70. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

71. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of California Trap and Trace Law, CIPA, Cal. Penal Code § 638.51**

72. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

73. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

74. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

75. Each of the LiveRamp, Comscore and Nielsen code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

76. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

77. Each of the LiveRamp, Comscore and Nielsen code is designed to identify to a reasonably likely degree the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "***sources***" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

78. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device for purposes of §§ 638.50-51. *See, e.g., Biglang-Awa-Castro v. SBE Restaurant Group, LLC*, 25VECV03590, 2026 Cal. Super. LEXIS 29752, at *3-4 (L.A. Co. Super. Ct. Apr. 16, 2026); *Schallert v. RocketGenius*, 25STCV35081, 2026 Cal. Super. LEXIS 25177, at *3-4 (L.A. Co. Super. Ct. March 24, 2026); *Hassid v. Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Lucky Opco LLC,* 25STCV03961, 2026 Cal. Super. LEXIS 24132, at *5-6 (L.A. Co. Super. Ct. Jan. 5, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1030-32 (C.D. Cal. 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Santoro v. Lulu & Georgia, Inc.*, 25STCV11722, 2025 Cal. Super. LEXIS 84529, at *8-9 (L.A. Co. Super. Ct. Nov. 21, 2025); *Zhizhi Xu v. Reuters News & Media, Inc.*, 25CV459918, 2025 Cal. Super. LEXIS 76169, at *8-10 (Santa Clara Co. Super Ct. Oct. 24, 2025); *Scarlett v. Future US, LLC*, CGC-25-

621912, 2025 Cal. Super. LEXIS 56166, at *11-14 (S.F. Co. Super. Ct. Sept. 5, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. The Data Brokers Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

79. Defendant did not obtain a court order before using or installing each of the LiveRamp, Comscore and Nielsen code on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

80. Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through LiveRamp, Comscore and Nielsen. Indeed, Plaintiff and the Class members expressly opted out of such data-sharing or data-selling through the consent interface on the Website.

81. Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

82. Defendant's conduct violating § 638.51 caused Plaintiff and the Class members significant injuries. These injuries include: invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct, including causing the ongoing monitoring of their internet activity.

83. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

84. Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

**<u>SECOND CAUSE OF ACTION</u>**

**Intrusion Upon Seclusion**

85. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

86. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

87. Defendant's deployment of the Data Broker code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed LiveRamp, Comscore and Nielsen to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

88. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the Data Broker code on the Website.

89. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

90. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

91. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the Data Broker code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

92. The intrusion described herein would be highly offensive to a reasonable person.

93. Defendant's intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; Defendant's unauthorized creation of detailed behavioral profiles of them; their mental anguish from knowledge of Defendant's secret monitoring; and chilling effects on their free online expression and inquiry due to Defendant's conduct, including causing the ongoing monitoring of their internet activity.

94. Defendant's invasion of the privacy of Plaintiff and Class members damaged them, and they are therefore entitled to compensatory damages, which includes monetary damages.

95. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Data Broker code on the Website was malicious, oppressive and willful.

96. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## THIRD CAUSE OF ACTION

**Violations of Federal Wiretap Act, as amended by the ECPA, 18 U.S.C. § 2510, *et seq.***

97. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

98. The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

99. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

100. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

101. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

102. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

103. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

104. Defendant is a "person" within the meaning of the Wiretap Act.

105. The Queryly code installed and deployed on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

106. Plaintiff had a reasonable expectation of privacy in her electronic communications with Defendant's Website, including the search queries she conducted on the Website.

107. A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting users' choices, intent, and behavior on a commercial website are sensitive. Such communications include searches, menu selections, and order interactions. They convey the substance and meaning of the communication.

108. Plaintiff reasonably expected that third parties such as Queryly were not intercepting, recording, or using the contents of her electronic communications with Defendant's Website.

109. On September 10, 2025, Plaintiff's search queries conducted on the Website were intercepted by Queryly at the moment she entered them on the Website, keystroke by keystroke. This was done without Plaintiff's consent. The data intercepted was monetized by Defendant and Queryly.

110. At all relevant times, Defendant acted knowingly, willfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Queryly code on the Website and understood that doing so would result in the interception and transmission of users' search queries to Queryly.

111. The unauthorized interception and use of Plaintiff's searches by Queryly was only possible because Defendant knowingly and intentionally placed and enabled the Queryly code on the Website. 18 U.S.C. § 2511(1)(a).

112. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiff and any profits made by the intercepting parties as a result of the violations, or

b. statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and

c. reasonable attorneys' fees and costs.

**<u>FOURTH CAUSE OF ACTION</u>**

**Violations of CIPA, Cal. Penal Code § 631**

113. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

114. CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally

tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

115. The Ninth Circuit confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). With respect to CIPA, the California Supreme Court has similarly concluded that the statute is intended to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe,* 11 Cal. 5th 183, 200 (2021).

116. The Website, including the Queryly code deployed on it, constitutes a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

117. Defendant violated subsections (iii) and (iv) of Cal. Penal Code § 631(a). First, Defendant has used or attempted to use "in any manner" the contents of search queries conducted by Plaintiff and Class members on the Website and transmitted to Queryly through the Queryly code.

118. Second, Defendant ***aids and abets*** violations of CIPA by knowingly providing substantial assistance to Queryly in its unauthorized interception of the content of the communications of Plaintiff and Class members with the Website, specifically the search queries they conducted on the Website. The Queryly code intentionally installed by Defendant on its

Website enables Queryly to intercept user communications in real-time. Through that code, Defendant ensures Queryly receives immediate access to the content of Plaintiff's and Class members' communications with the Website, namely the search queries they conducted on the Website.

119. The interception and transmission of the content of the search queries conducted by Plaintiff and Class members on the Website, constitutes unauthorized access to communications while in transit. This interception and transmission operated and operates automatically and without valid consent.

120. CIPA imposes civil liability and statutory damages for these violations under California Penal Code § 637.2. Plaintiff and Class members have suffered injury due to the interception and disclosure of the content of the communications of Plaintiff and Class members with the Website, including the search queries they conducted on the Website. The interception and disclosure has infringed upon their right to freely navigate the internet. Plaintiff and Class members have also suffered by virtue of the unauthorized collection of the content of their search terms for unspecified use by Queryly for monetary gain. This collection was enabled by Defendant's intentional installation of the Queryly code on the Website.

## PRAYER

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;
2. An award of actual damages pursuant to the Wiretap Act;
3. An award of statutory damages pursuant to CIPA and the Wiretap Act;
4. An award of punitive damages;
5. An award of nominal damages;
6. An order for full restitution;
7. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

8. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

9. Reasonable attorneys' fees and costs; and

10. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: September 9, 2026

TAULER SMITH LLP

By: ______________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Tarah Williams*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: September 9, 2026

TAULER SMITH LLP

By: ______________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Tarah Williams*